# Chapman *v.* Lee's Adm'r.

*Action by Vendor, for Purchase-Money of Lands.*

1. *When purchaser must pay for lands, notwithstanding defect in title.*—When a large tract of land is sold at a specified price per acre, for cash or its equivalent, the numbers and quantity of each parcel being described in the written contract and deed; with an express stipulation that, on a survey within a specified time, at the instance of either party, any mistake in the quantity or description of the land is to be corrected, and the payment re-adjusted accordingly; the purchaser cannot be compelled to pay for a fractional lot, which was not mentioned in the contract or conveyance, and to which the vendor shows no title, except a claim of possession long enough to perfect a title under the statute of limitations; but, if he actually received possession of the lot

[ Chapman v. Lee's Adm'r. ]

under the contract, and continues to hold it, he cannot refuse to pay for it on account of the defective title.

2. *Tender of deed, and abstract of title.*—It is the duty of the purchaser to prepare a deed, and tender it to the vendor to be executed; and it is the duty of the vendor, when required, to furnish to the purchaser an abstract of the title.

3. *Plea of tender.*—A plea of tender before suit brought, accompanied with the payment of money into court, must include interest up to the time of the payment, or show a legal reason why it should not be included.

APPEAL from the Circuit Court of Sumter.

Tried before the Hon. LUTHER R. SMITH.

This action was brought by Reuben Chapman, against the personal representative of Mrs. Susan R. Lee, deceased, to recover the sum of $1,071.40, with interest thereon from the 1st day of January, 1859, the alleged unpaid balance of the purchase-money for a tract of land sold and conveyed by the plaintiff to Mrs. Lee in her life-time; and was commenced on the 9th September, 1865. The case was before this court, on a former appeal, at its January term, 1872, when the judgment of the lower court was reversed, and the cause remanded, as shown by the report in 47 Ala. 143-56, where the pleadings are set out in full.

The contract between the parties was in the following words: "This contract, made and entered into this 23d day of December, A. D. 1858, between Reuben Chapman, of Madison county, of the first part, and John R. Lee, of Sumter county, of the second part, witnesseth: That the party of the first part has this day bargained and sold to the party of the second part all his lands lying and being in township number eighteen (18), range number two (2), west, in the said county of Sumter, supposed to be known according to United States surveys, and to contain the quantity as follows, to-wit," specifying the legal subdivisions, and the quantity contained in each. "All of the said lands the said party of the second part buys, and agrees to pay to the party of the first part therefor at the rate of twenty dollars per acre, all considered as cash on the 1st day of January next, 1859; but the said party of the second part proposes, and the party of the first part agrees to receive one-half of the sum in a draft of this date, drawn by the party of the second part as the agent of his mother, Susan Lee (for whose benefit this contract is made, and to whom the party of the second part is to make a warranty deed for all the lands hereby sold, with the full relinquishment of the dower of the wife of the party of the first part), on the house of Gary, Maggard & Co., of Mobile, payable on the 1st day of January next, at their business house in Mobile, and accepted by them; and for the balance of the said sum, the said party of the second part agrees as before

[Chapman v. Lee's Adm'r.]

stated—draws and delivers to the party of the first part his drafts on said house, one for one-half of the balance, with one year's interest on the whole, falling due on 1st January, 1860, and the other for the balance, according to the estimated quantity of land as herein stated, with interest thereon for one year, to fall due on 1st January, 1861. It is understood by the parties to this contract, that either party may, at any time within two years, have the lands surveyed by a legal officer; and that the amount to be paid will be estimated accordingly, and the sum to be adjusted as on the 1st January, 1859. If the party of the first part, with his wife's relinquishment of dower, as is requested by the party of the second part, executes his absolute deed for said lands herein described, before the expiration of the two years, it shall contain a covenant authorizing a survey of said lands, and correcting the numbers, description, and quantity; as it is understood that this contract is for the sale and purchase of all the lands said party of the first part holds in the said township, lying on the east side of Sucarnatchie. It is understood, that the legal fees for the survey shall be equally divided between the contracting parties. It is understood, also, that possession of the said land will be given on the 1st day of January next."

"Attest:   *G. B. Saunders.*      "R. CHAPMAN (L. S.)
                                 "JOHN R. LEE; agent
                                        for Susan Lee."

Afterwards, on the same day, Chapman and his wife executed and delivered to Mrs. Lee a deed for the lands, with full covenants of warranty, describing them as they were described in the above contract; which, it was declared, "is made a part of this deed, and the intention in making this deed is that it shall conform in all respects to said contract." In the autumn of 1860, after notice to Mrs. Lee's agent, Chapman had a survey of the lands made by W. E. Chiles, the county surveyor of Sumter. On this survey, it was ascertained, that the lands specified and described in the deed and contract contained six acres more than they were therein estimated to contain; and another small tract, described as "fractional lot C" in section twenty-three (23), which was not specified in either the deed or the contract, was found to contain forty-seven acres and 57-100. Contending that this tract was embraced in the contract, and that possession of it passed under the contract, Chapman brought the suit to recover the price of this tract and the additional six acres, at $20 per acre, with interest, and half the cost of the survey. The material facts proved on the second trial, in reference to this particular tract and the survey, seem to be stated in the

opinion of the court. The transcript having been lost, the reporter is not able to make an additional statement of the facts; nor can he set out the several rulings and charges of the court to which exceptions were reserved by the plaintiff below, and which are here presented for revision.

WATTS & WATTS, with R. H. SMITH, and THOS. COBBS, for appellant.

SNEDICOR & COCKRELL, with THOS. B. WETMORE, contra.

MANNING, J.—The conveyance stipulated for in the contract, and executed afterwards on the same day the contract was made, describes all the parcels of land which the grantor professed or intended then to convey. They were the same as those described in the contract. But neither in it, nor in the deed, was "fraction C of section 23" mentioned as a part of the property sold; nor is any muniment of title produced to show that it belonged to Chapman. Indeed, it does not appear to be known by the parties to this suit, what person is, by conveyance, paper title, or inheritance, the true owner of this fraction. In the fall of 1860, when the survey was made, it was unoccupied, and seemed to have been so several years; there was no fence then upon it; and only a small portion of it, about six acres, appeared to have ever been cleared and cultivated. Lying beside the lands sold by Chapman to Mrs. Lee, a part of it seems, before that sale, to have been sometimes cultivated by him, and sometimes by others. The witness, Elliott, testifies that he lived on, and cultivated a few acres thereof, in 1858, the year of the sale; and afterwards, though not until some years afterwards, Mrs. Lee, or some of her family, occupied and used a part of the land. But it was not represented or sold as a part of her estate, when, after her death, the other contiguous lands were sold by the administrator, under the order of the Probate Court, upon his petition. Nor was she, nor any one on her behalf, present at the survey made by Chiles in the autumn of 1860; when he hesitatingly made a partial survey of "fraction C," at the instance of one of the witnesses, who was present as the agent of Mr. Chapman, and represented that it was a part of the land the latter had sold to Mrs. Lee. Nor did the surveyor mark it, as he marked the other parcels surveyed, with Mr. Chapman's name, on the map he made on that occasion.

Not being mentioned in the contract, nor conveyed by the deed, as Mr. Chapman's, "fraction C" can not be made the subject of a charge against Mrs. Lee's administrator, unless

it be shown that it was Chapman's land when the contract was entered into, and is thus brought within the general description of the lands held by him in township eighteen, range two, west, east of the Sucarnatchie river. Ordinarily, title to land must be authenticated by a deed, will, or some other written evidence of it, from one who has title, to the vendor, or to an ancestor, or other person from whom it comes to the vendor by descent; that is, by an instrument of which an abstract may be set forth in the vendor's abstract of title. I do not know of any case, in which a purchaser of land, by an executory contract, in no part executed on either side, and without any stipulation to that effect, has been held bound to take a parcel, which, without any color of title to it, the vendor claimed to have had in his possession long enough to have acquired, by the statute of limitations, a right to hold and convey it as his own. Of course, if the parties contracted for the sale and purchase of land so held, and the purchaser received as such possession of it from the seller, he would be bound by his agreement.

"Most generally," said this court, in *Cullum v. Br. Bank of Mobile*, 4 Ala. p. 28, "the inducement of a purchaser, in treating for the acquisition of land, is to become its owner. We do not mean to assert that one person may not legally contract with another, who has merely the possession of the land, although his title to it may be known to be imperfect, or even bad; but our intention is to show what are the *prima facie* intendments, springing out of contracts for the purchase of land, when there are no stipulations between the parties with reference to the title. *   *   * A similar rule obtains in the courts of law, where all titles, as between the vendor and purchaser, are declared either good or bad, according as their merits may be; for there is no middle term to designate a defective title" (*Romlly v. James*, 6 Taunt. 263); "and every title, to be marketable, must be good in equity, as well as at law."—*Maberly v. Robbins*, 5 Taunt. 625. "The right to a good title," said Sir William Grant, in *Ogilvie v. Foljambe* (3 Meriv. 33), "is *a* right, not growing out of the agreement of the parties, but which is given by law. The purchaser insists on having a good title; not because it is stipulated for, but on the general right of a purchaser to require it." And in Addison on Contracts, it is said: "An agreement to make out a good title is implied from every contract for the sale of realty, and a purchaser is not bound to accept a doubtful title."—Vol. 2, §513, of Morgan's Amer. Ed. See, also, *Dearth v. Williamson*, 2 Serg. & R. 498; *Souler v. Drake*, 5 B. & Adolph. 992; *Dick v. Donald*, 1 Bligh, N. S. 655.

The purchaser, then, having the right to require a good

title, and not being bound to accept a doubtful one, can he be compelled to accept and pay for land which the seller claims to own only by having had possession of it himself for the time prescribed by the statute of limitations as a bar to a suit to recover it, against him? Apart from any scruples of conscience, which a buyer might be supposed to entertain against keeping the true owner out of his property, upon such a title, how is its validity to be established against the true owner? Only by the oral evidence of witnesses, who may die, or move away, or whose memories may fail. And what are the facts that must be established by such evidence? Mr. Washburn says: "Inasmuch as the title of the true owner may, by the application of this statute, be often divested by the wrongful act of another, the law is stringent in requiring clear proof of the requisite facts. There must be, *first*, an actual occupancy; clear, definite, positive, and notorious. *Second*, it must be continued, adverse, and exclusive, during the whole period prescribed by the statute. *Third*, it must be with an intention to claim title to the land occupied. * * * If, therefore, the intention is wanting, of claiming against the true owner, the possession * * * will not be adverse, nor, however long continued, bar the owner's right of entry." Moreover, if the possession of the tenant can not be referred to "some written instrument, like a deed, levy of execution, decree of court, or the like, in which the parcel in question is described by metes and bounds," * * * * * the possession reaches no further than there is a *pedis possessio*: an actual occupation by some defined, certain limits, indicated by a substantial enclosure, or something of a like notorious character. Every element which goes to make a possession adverse must concur, or it will not confer a title. And if, in the language of the court of Pennsylvania, "there be one element more distinctly material than another, in conferring title, where all requisites are so, it is the existence of a *continuous* adverse possession, for the time prescribed by law. An actual interruption of the possession is fatal to the claim under it."—Washburn's Law of Real Property, 3d vol., 3d ed., 123–4.

Now, applying these principles to the case in hand, what certainty could there be, if the true owner of "fraction C" had sued for it, on the first of January, 1859, or at any time afterwards, that witnesses could have been found and produced, able and willing to prove all the conditions mentioned by Mr. Washburn, which were essential to establish title in Chapman? The fact that he had not included it in the contract or deed, would tend to show he did not then claim it. For, if he had taken and kept possession of this land, so long

[Chapman v. Lee's Adm'r.]

a time, with the intent to invest himself in this manner with the title, and to hold it against the true owner, it would seem that the consciousness of this would have prevented him from forgetting to include "fraction C" in those writings, or from omitting it out of the settlement, at a time when he was selling out all his lands in that locality, and computing the amount he was to receive for them. In the face of this fact, such an intent, if it existed, could hardly have been proved, in the event of Mr. Chapman's death, by any body. How, then, under the rules of law we have referred to, could a purchaser be made to accept so doubtful a title? In a similar case, but stronger than the present, where the question was, whether a purchaser in possession was bound to accept and pay for a title, known by him, when the contract was entered into, to be dependent, in part at least, on a tax-deed, the Supreme Court of Pennsylvania said: "Sales for taxes have been seldom so conducted as to give a good title to the purchaser. It would, therefore, require clear expressions in the articles of agreement, to induce the conclusion that three dollars and seventy-five cents an acre was meant to be given for no more than the title under the sale for taxes."—*Dearth v. Williamson*, 2 Serg. & R. 500. A like observation would be pertinent, and could be made with much more force, of a title by the statute of limitations, in a case like the present.

There are numerous decisions of this court, holding that a purchaser of land, who has received, and is in possession of it as such, can not, when he is sued upon his notes given for the purchase-money, effectually defend himself against them, by setting up that the vendor had not a good title. He can not avoid the obligations of his contract, and continue to enjoy its benefits. Whether those decisions are applicable to the present cause, will depend upon the result of the inquiry, whether "fraction C" was included among the parcels of land sold by Chapman to Mrs. Lee; and whether or not he delivered possession of it to her, and she received it, as purchaser from him? If Mr. Chapman occupied some part of it, only as the vacant land of some unknown owner, lying conveniently by his own, and merely withdrew from it, when he transferred the possession of the main tract he had sold to Mrs. Lee; and she afterwards, the land being vacant, took possession of and occupied it, she would not, when sued upon the contract set up in this action, be precluded from denying Chapman's title. It will be for the jury, under proper charges from the court, to determine whether Chapman delivered possession of "fraction C" to Mrs. Lee, as purchaser thereof from him, and she so accepted and held it.

2. Ever since the decision in *Wade v. Killough* (5 S. & Por. 450), it has been held to be the duty of the purchaser of land, in this State, to prepare and tender to the vendor the conveyance to be executed by the latter. But it is incumbent on him to furnish, when required, an abstract of his title to the buyer. · Examining the instructions given by the court to the jury, and excepted to, on behalf of defendant, it will be perceived that it erred in those numbered 2, 3, and 4, respectively, in which they were informed that plaintiff must have made or tendered a deed of fraction C, as a condition precedent to his right to recover in this action.

3. The court erred, also, in overruling the demurrer to the plea of tender, filed on the 13th of April, 1874. The action had then been pending many years; and the plea averring that, before it was brought, Mrs. Lee had tendered to plaintiff "the amount due to him, to-wit: one hundred and seventy-two and 50-100 dollars," further sets forth that defendant then brought and tendered the same sum in court, without the interest that had in the meantime accrued, and without showing any legal reason why the interest should not be included. The plea was not an answer to the complaint, and the demurrer to it should have been sustained.

There was no error in the refusal of the court to grant the motion of plaintiff, to relieve him from, and charge defendant with, the costs, $58.85, which plaintiff had been required to pay in 1869, as a condition for leave to file an amended complaint. Nothing occurring after that time, entitled the mover to the order prayed for.

In some of the charges given at the request of appellant, which are set out in the record, there are errors, which, of course, could not be assigned on his appeal; and cannot, therefore, now be corrected. What we have said above, will enable the circuit judge to avoid them hereafter. It is unnecessary to notice any of the other questions, as they probably will not arise again.

Let the judgment be reversed, and the cause be remanded.

BRICKELL, C. J., not sitting, having been of counsel.